10 A.3d 1167

**Charles Francis WILLIAMS, Jr.**

v.

**STATE of Maryland.**

**No. 16, Sept. Term, 2010.**

Court of Appeals of Maryland.

Jan. 5, 2011.

James Brewster Hopewell, Riverdale, MD, for petitioner.

Douglas F. Gansler, Atty. Gen. of Maryland (Jeremy M. McCoy, Asst. Atty. Gen., Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, BARBERA, JJ.

BATTAGLIA, J.

In this case, we enter into the constitutional fray involving the scope of the Second Amendment right to bear arms,[1] recently explored by the Supreme Court in *District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) and *McDonald v. City of Chicago,* —— U.S. ——, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010).

Petitioner, Charles F. Williams, Jr., seeks to overturn his conviction in the Circuit Court for Prince George's County for unlawful possession of a handgun, pursuant to Section 4–203(a)(1)(i) of the Criminal Law Article, Maryland Code (2002),[2] asserting that Maryland's regulatory scheme for hand-

---

**1.** The Second Amendment of the United States Constitution provides:
A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

**2.** All references to Section 4–203 of the Criminal Law Article throughout are to Maryland Code (2002), unless otherwise noted. Section 4–

guns violates his right to "keep and carry arms" under the Second Amendment. The Court of Special Appeals affirmed Williams' conviction, in a reported opinion, *Williams v. State*, 188 Md.App. 691, 982 A.2d 1168 (2009), and we granted certiorari, *Williams v. State*, 412 Md. 495, 988 A.2d 1008 (2010), to answer the following question:

Are Md.Code Ann. Criminal Law § 4–203, Public Safety §§ 5–301, *et seq.*, and COMAR 29.03.02.04 unconstitutional in light of *Heller v. District of Columbia?* [3]

We shall hold that Section 4–203(a)(1)(i) of the Criminal Law Article, which prohibits wearing, carrying, or transporting a handgun, without a permit and outside of one's home, is outside of the scope of the Second Amendment. We also shall

203(a) generally prohibits wearing, carrying, or transporting a handgun:

(a) *Prohibited.*—(1) Except as provided in subsection (b) of this section, a person may not:

(i) wear, carry, or transport a handgun, whether concealed or open, on or about the person; or

(ii) wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State.

Section 4–203(b) enumerates several exceptions to the prohibition, significantly when one has secured a permit:

(2) the wearing, carrying, or transporting of a handgun by a person to whom a permit to wear, carry, or transport the handgun has been issued under [§§ 5–301–5–314 of the Public Safety Article, Maryland Code (2003)];

and when one wears, carries, or transports a handgun on "real estate that the person owns or leases":

(6) the wearing, carrying, or transporting of a handgun by a person on real estate that the person owns or leases or where the person resides or within the confines of a business establishment that the person owns or leases; . . . .

**3.** In his brief in this Court, Williams also argued that evidence of the handgun should have been suppressed as the fruit of an unlawful search and that a statement he made to police should have been suppressed, because he was subjected to custodial interrogation. Williams, however, did not include any questions regarding such in his Petition for Certiorari. Further, when asked to address the same concerns, the Court of Special Appeals had determined that those issues were not properly preserved for appellate review.

hold that, because Williams failed to apply for a permit to wear, carry, or transport a handgun, he lacks standing to challenge Section 5–301 *et seq.* of the Public Safety Article, Maryland Code (2003),[4] as well as COMAR 29.03.02.04.[5] As a result, Williams's conviction will stand.

---

4. All references to Section 5–301 *et seq.* of the Public Safety Article throughout are to Maryland Code (2003), unless otherwise noted. Section 5–301(d) defines a "permit" as follows:

(d) *Permit.*—"Permit" means a permit issued by the Secretary to carry, wear, or transport a handgun.

Section 5–302 establishes a "Handgun Permit Review Board" in the Department of Public Safety and Correctional Services. Section 5–303 requires a "permit" before a person "carries, wears, or transports a handgun." Section 5–304 provides that an application for a permit "shall be made under oath." Section 5–305 states that permit applicants must undergo a "criminal history records check," and Section 5–306 states various "qualifications for permit," as follows:

(a) *In general.*—Subject to subsection (b) of this section, the Secretary shall issue a permit within a reasonable time to a person who the Secretary finds:

(1) is an adult;

(2)(i) has not been convicted of a felony or of a misdemeanor for which a sentence of imprisonment for more than 1 year has been imposed; or

(ii) if convicted of a crime described in item (i) of this item, has been pardoned or has been granted relief under 18 U.S.C. § 925(c);

(3) has not been convicted of a crime involving the possession, use, or distribution of a controlled dangerous substance;

(4) is not presently an alcoholic, addict, or habitual user of a controlled dangerous substance unless the habitual use of the controlled dangerous substance is under legitimate medical direction; and

(5) based on an investigation:

(i) has not exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another; and

(ii) has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger.

(b) *Applicant under age of 30 years.*—An applicant under the age of 30 years is qualified only if the Secretary finds that the applicant has not been:

(1) committed to a detention, training, or correctional institution for juveniles for longer than 1 year after an adjudication of delinquency by a juvenile court; or

(2) adjudicated delinquent by a juvenile court for:

(i) an act that would be a crime of violence if committed by an adult;

(ii) an act that would be a felony in this State if committed by an adult; or

During a bench trial before the Honorable Sean D. Wallace, the State presented the following facts, describing a police officer's encounter with Williams near a bus stop:

The facts, as stipulated, had the matter gone to trial, the facts would show that on October 1, 2007, at approximately 5:00 p.m., Officer Molake with the Prince George's County Police Department, was in the area of the Baltimore— Washington Parkway and Landover Road in Prince George's County, Maryland, and as he was driving in that

(iii) an act that would be a misdemeanor in this State that carries a statutory penalty of more than 2 years if committed by an adult.

**5.** COMAR 29.03.02.04 describes "criteria for issuance of permit" and relevantly

In making a determination as to whether a permit will be issued to the applicant, the following areas will be a part of every investigation and will be considered in determining whether a permit is issued:
A. Verification of the information supplied by the applicant in the application;
B. Occupation or profession of the applicant;
C. Geographical area of residence and employment of the applicant;
D. Criminal record of applicant, including any juvenile record for an applicant younger than 30 years old, as specifically outlined in Public Safety Article, § 5–306(b), Annotated Code of Maryland;
E. Medical history of applicant as it may pertain to the applicant's fitness to wear, carry, or transport a handgun;
F. Psychiatric or psychological background of applicant as it may pertain to the applicant's fitness to wear, carry, or transport a handgun;
G. Reasons given by the applicant as to whether those reasons are good and substantial;
H. Age of applicant;
I. Applicant's use of intoxicating beverages and drugs;
J. Information received from personal references and other persons interviewed;
K. Information received from business or employment references as may be necessary in the discretion of the investigator;
L. Whether the applicant has any alternative available to him for protection other than a handgun permit;
M. Whether the applicant falls within those classes of individuals who do not need permits as outlined in the Handgun Permit Law;
N. The applicant's propensity for violence or instability which could reasonably render his wearing, carrying, or transporting of a handgun a danger to himself or other persons he may come in contact with;
O. Whether the permit is necessary as a reasonable precaution for the applicant against apprehended danger.

area, he observed the defendant going through a backpack near a wooded area nearby the cross area, and at one time, as the officer turned his cruiser around, he observed the defendant turn and place something in the brush area as if he was hiding something.

Officer Molake made contact with the defendant, who he would identify as the gentleman seated to the left with the green shirt and asked him what he was doing. The defendant told him he was going through the backpack to see what was in it. He then asked the defendant what he went and hid in the bushes, and the defendant hesitated and then stated "my gun."

The facts described the police officer's recovery of Williams's handgun and Williams's statement to police:

Officer Molake then recovered an Austria [sic] made, black Glock handgun with 15 rounds in the magazine in the brush area where he saw the defendant go.

The defendant gave a written statement after being given his Miranda rights by Officer Santa Cruz, admitting to possession of the gun and placing the gun in the bush area where the officer subsequently located it.

The handgun test-fired as positive.

The facts provided the following, regarding Williams's purchase of the handgun, apparently for "self-defense":

The defense would have provided evidence by way of documents that would show that the defendant purchased the handgun in Realco at 6108 Marlboro Pike in Forestville, Maryland, on August 15 of 2007, and that would be shown through Exhibit 1. Paid the balance that was due on that handgun on September 14, 2007, which will be shown in Exhibit 2; that the defense would have provided evidence that the defendant completed the Maryland State Police application and affidavit to purchase a regulated firearm application, which is a total of three pages, on August 15, 2007, which will be shown in Exhibit 3. He received the certificate of completion, which is shown in Exhibits 4 and 5, on August 15, 2007.

The defendant would have testified that he purchased the handgun for self-defense, and that on the date of this arrest, he had just left the handgun at his girlfriend's house, place of residence. When he got off work, he went to her residence and picked up that handgun and was en route to his home when the arrest occurred behind the bus stop.

The defendant was again given Miranda rights and gave a written statement that will be shown in the State's Exhibits Number 3 and 4.

Judge Wallace found Williams guilty of wearing, carrying, or transporting a handgun in violation of Section 4–203(a)(1)(i) and sentenced him to three years' incarceration, with two years suspended. The Court of Special Appeals affirmed, determining that the Second Amendment is not applicable to the States,[6] and that, were the Second Amendment to apply to Maryland, "it would not invalidate the statute at issue here," because Section 4–203(b)(6) expressly permits wearing, carrying, or transporting a handgun in one's residence, thereby preserving the right "to keep and bear arms in the home for the purpose of immediate self-defense." *Williams*, 188 Md. App. at 699, 982 A.2d at 1172.

█ Before us, as he did in the Circuit Court in a "Motion to Dismiss Indictment," and in his brief before the Court of Special Appeals, Williams asserts that the prohibition in Section 4–203(a) against wearing, carrying, or transporting a handgun without a permit and outside of one's home, infringes upon his Second Amendment right "to keep and bear arms." He contends that the Supreme Court opinions in *Heller* and *McDonald* make clear that the Second Amendment establishes a general "right of persons to keep and bear arms for lawful purposes."

---

**6.** The Circuit Court's decision and the Court of Special Appeals's opinion in the present case were rendered prior to the Supreme Court's decision in *McDonald v. City of Chicago*, —— U.S. ——, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), which made the Second Amendment applicable to the States via the due process clause of the Fourteenth Amendment.

The State counters that the opinions in *Heller* and *Mc-Donald* together stand for the proposition that, pursuant to the Second Amendment, "states may not generally prohibit the possession of a handgun in the home for the purpose of self-defense, but remain free to enact reasonable restrictions on the possession and use of firearms." The State contends that the statutory scheme embodied in Section 4–203 is eminently reasonable, because Section 4–203(b)(6) expressly permits wearing, carrying, or transporting a handgun in the home.

We begin by exploring the dictates of Section 4–203(a) of the Criminal Law Article, which contains a prohibition against wearing, carrying, or transporting a handgun in public, "whether concealed or open":

(a) *Prohibited.*—(1) Except as provided in subsection (b) of this section, a person may not:

(i) wear, carry, or transport a handgun, whether concealed or open, on or about the person; or

(ii) wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State.

The exceptions to the prohibition, contained in Section 4–203(b), are many:

(b) *Exceptions.*—This section does not prohibit:

(1) the wearing, carrying, or transporting of a handgun by a person who is on active assignment engaged in law enforcement, is authorized at the time and under the circumstances to wear, carry, or transport the handgun as part of the person's official equipment, and is:

(i) a law enforcement official of the United States, the State, or a county or city of the State;

(ii) a member of the armed forces of the United States or the National Guard on duty or traveling to or from duty;

(iii) a law enforcement official of another state or subdivision of another state temporarily in this State on official business;

(iv) a correctional officer or warden of a correctional facility in the State;

(v) a sheriff or full-time assistant or deputy sheriff of the State; or

(vi) a temporary or part-time sheriff's deputy;

(2) the wearing, carrying, or transporting of a handgun by a person to whom a permit to wear, carry, or transport the handgun has been issued under [§§ 5–301–5–314 of the Public Safety Article, Maryland Code (2003) ];

(3) the carrying of a handgun on the person or in a vehicle while the person is transporting the handgun to or from the place of legal purchase or sale, or to or from a bona fide repair shop, or between bona fide residences of the person, or between the bona fide residence and place of business of the person, if the business is operated and owned substantially by the person;

(4) the wearing, carrying, or transporting by a person of a handgun used in connection with an organized military activity, a target shoot, formal or informal target practice, sport shooting event, hunting, a Department of Natural Resources—sponsored firearms and hunter safety class, trapping, or a dog obedience training class or show, while the person is engaged in, on the way to, or returning from that activity;

(5) the moving by a bona fide gun collector of part or all of the collector's gun collection from place to place for public or private exhibition if each handgun is unloaded and carried in an enclosed case or an enclosed holster;

(6) the wearing, carrying, or transporting of a handgun by a person on real estate that the person owns or leases or where the person resides or within the confines of a business establishment that the person owns or leases;

(7) the wearing, carrying, or transporting of a handgun by a supervisory employee:

(i) in the course of employment;

(ii) within the confines of the business establishment in which the supervisory employee is employed;

(iii) when so authorized by the owner or manager of the business establishment; or

(8) the carrying or transporting of a signal pistol or other visual distress signal approved by the United States Coast Guard in a vessel on the waterways of the State or, if the signal pistol or other visual distress signal is unloaded and carried in an enclosed case, in a vehicle.

■ Here, the relevant exceptions are Section 4–203(b)(2), involving a permit to wear, carry, or transport a handgun in public, as well as Section 4–203(b)(6), permitting the wearing, carrying, or transporting of a handgun in one's residence. What is notable in the present case is that Williams did not apply for a permit.[7] Moreover, at the time of his arrest, he was not wearing, carrying, or transporting a handgun in his residence, as permitted by the statute.

Williams, nevertheless, principally relies upon the Supreme Court's opinions in *Heller*, 554 U.S. at 570, 128 S.Ct. at 2783, 171 L.Ed.2d at 637, and *McDonald*, —— U.S. at ——, 130 S.Ct. at 3020, 177 L.Ed.2d at 894, in asserting that the Second

---

7. Williams argues, in this regard, that Sections 5–301 *et seq.* of the Public Safety Article, Maryland Code (2003), as well as Title 29, subtitle 3 of the Code of Maryland Regulations, together governing handgun permitting, impose an impermissible burden on citizens seeking to exercise the right to "keep and carry a handgun." Williams acknowledges that he has "not filed an application for a permit to carry a handgun," but asserts that as a result of the regulatory scheme, "any such application would have been denied." The State counters that nearly 93 percent of handgun permit applicants from 2006 to 2009 were issued permits. *See Maryland Department of State Police 2009 Annual Report*, available at *http://www.mdsp.org/downloads/2009_AnnualReport.pdf.* Nevertheless, because Williams failed to file an application for a permit to carry a handgun, he lacks standing to challenge the constitutionality of Sections 5–301 *et seq.* of the Public Safety Article, as well as Title 29, subtitle 3 of the Code of Maryland Regulations. *See, e.g., Gregg v. State,* 409 Md. 698, 704 n. 2, 976 A.2d 999, 1002 n. 2 (2009) (reasoning appellant had standing to file "Petition for DNA Evidence—Post Conviction Review," because he had been convicted of first-degree murder); *Evans v. State,* 396 Md. 256, 328, 914 A.2d 25, 68 (2006) (reasoning that "an individual or an organization 'has no standing in court unless he has also suffered some kind of special damage from such wrong differing in character and kind from that suffered by the general public' ") (citation omitted).

Amendment establishes a general "right of persons to keep and bear arms for lawful purposes." In *Heller*, Mr. Heller had applied for and was denied a "registration certificate" to possess a handgun in his home, pursuant to the District of Columbia's gun control scheme. 554 U.S. at 573–77, 128 S.Ct. at 2788, 171 L.Ed.2d at 647. Section 7–2502.01(a) of the D.C.Code (2001) prohibited "possess[ion] or control" of any firearm, without a "valid registration certificate":

> (a) Except as otherwise provided in this unit, no person or organization in the District of Columbia ("District") shall receive, possess, control, transfer, offer for sale, sell, give, or deliver any destructive device, and no person or organization in the District shall possess or control any firearm, unless the person or organization holds a valid registration certificate for the firearm.

Section 7–2502.02(a)(4) of the D.C.Code (2001) prohibited the registration of *handguns*, without an exception for possession in one's home:

> (a) A registration certificate shall not be issued for a:
>
> (1) Sawed-off shotgun;
>
> (2) Machine gun;
>
> (3) Short-barreled rifle; or
>
> (4) Pistol [8] not validly registered to the current registrant in the District prior to September 24, 1976, except that the provisions of this section shall not apply to any organization that employs at least 1 commissioned special police officer or other employee licensed to carry a firearm and that arms the employee with a firearm during the employee's duty hours or to a police officer who has retired from the Metropolitan Police Department.

Section 7–2507.02 of the D.C.Code (2001) mandated that any other firearm within one's home be kept "unloaded and disassembled or bound by a trigger lock":

---

**8.** Section 7–2501.01(12) of the D.C.Code defines a "pistol" as "any firearm originally designed to be fired by use of a single *hand*." (emphasis added).

Except for law enforcement personnel described in § 7–2502.01(b)(1), each registrant shall keep any firearm in his possession unloaded and disassembled or bound by a trigger lock or similar device unless such firearm is kept at his place of business, or while being used for lawful recreational purposes within the District of Columbia.

Sections 22–4504(a) and 22–4515 of the D.C.Code (2001) made carrying an unlicenced pistol in one's home or on one's land a misdemeanor. Section 22–4504(a) stated, in relevant part:

(a) No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon capable of being so concealed. Whoever violates this section shall be punished as provided in § 22–4515. . . .

Section 22–4515 of the D.C.Code (2001) in turn, stated:

Any violation of any provision of this chapter for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than 1 year, or both.

Mr. Heller filed a complaint in the United States District Court for the District of Columbia seeking declaratory and injunctive relief from the denial of his application for a "registration certificate" to possess a handgun in his home, the licensing requirement insofar as it prohibited the carrying of a handgun in the home, and the trigger-lock requirement insofar as it prohibited the possession of "functional firearms" in the home. The District Court dismissed the complaint, and the United States Court of Appeals for the District of Columbia Circuit reversed, reasoning that the Second Amendment precluded the District from "flatly ban[ning] the keeping of a handgun in the home." *Parker v. District of Columbia,* 478 F.3d 370, 400 (D.C.Cir.2007). The Supreme Court granted the District's petition for a writ of certiorari, presenting the following question:

Whether the following provisions—D.C.Code §§ 7–2502.02(a)(4), 22–4504(a), and 7–2507.02—violate the Second

Amendment rights of individuals who are not affiliated with any state-regulated militia, but who wish to keep handguns and other firearms for private use in their homes?

Before the Court, the District argued that the Second Amendment protects "only militia-related firearm rights." Alternatively, the District contended that prohibiting handgun possession in the home was reasonable, because residents were permitted to possess shotguns and rifles, albeit unloaded or bound by a trigger lock. Mr. Heller countered that the Second Amendment protects an individual right to possess a firearm for "traditionally lawful purposes, such as self-defense within the home." 554 U.S. at 577, 128 S.Ct. at 2789, 171 L.Ed.2d at 648.

Embracing an original meaning approach, Justice Antonin Scalia, writing for the Court, interpreted the language of the Second Amendment as conferring an individual right "to keep and bear Arms." 554 U.S. at 581, 128 S.Ct. at 2791, 171 L.Ed.2d at 651. The Court considered the substance of that individual right as "simply a common way of referring to possessing arms, for militiamen and everyone else." *Id.* at 583, 128 S.Ct. at 2792, 171 L.Ed.2d at 652. Similarly, the phrase "bear Arms," reasoned the Court, referred to the "carrying of weapons," both in an organized militia and for other purposes, such as self-defense. *Id.* at 584–87, 128 S.Ct. at 2793–94, 171 L.Ed.2d at 653–54. The Court concluded that "preserving the militia" was not the only aim of the Second Amendment, as the founders "most undoubtedly thought it even more important for self-defense and hunting." *Id.* at 599, 128 S.Ct. at 2801, 171 L.Ed.2d at 662. This right "to keep and bear Arms," however, has limitations:

Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through 19th century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second

Amendment or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626–27, 128 S.Ct. at 2816–17, 171 L.Ed.2d at 678 (internal citations omitted).

In declaring Sections 7–2502.02(a)(4) (prohibiting the registration of handguns, without a home exception) and 22–4504(a) (prohibiting carrying a handgun within one's home, without a license) unconstitutional, the Court emphasized that handguns were "overwhelmingly chosen by American society" for self-defense and determined that under any standard of scrutiny, "banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family, would fail constitutional muster." *Id.* at 628–29, 128 S.Ct. at 2817–18, 171 L.Ed.2d at 679 (citation omitted) (internal quotation marks omitted). The District's trigger-lock requirement, contained in Section 7–2507.02, did not fare any better, according to the Court, because the provision "ma[de] it impossible for citizens to use [firearms] for the core lawful purpose of self-defense" within the home. *Id.* at 630, 128 S.Ct. at 2818, 171 L.Ed.2d at 680. Therefore, the prohibition against handguns, even within one's home, as well as the trigger-lock requirement for all firearms kept within the home, were declared unconstitutional.

Shortly thereafter, in *McDonald,* —— U.S. at ——, 130 S.Ct. at 3020, 177 L.Ed.2d at 894, the Supreme Court was asked to consider whether the Second Amendment applied to the States.[9] In that case, Otis McDonald, Adam Orlov, Colleen

---

**9.** In so doing, the Supreme Court considered the following question on certiorari:

Lawson, and David Lawson filed a complaint in the United States District Court for the Northern District of Illinois, seeking a declaratory judgment that several Chicago ordinances violated the Second and Fourteenth Amendments. The Chicago residents alleged that the City had denied their applications to register handguns for possession in the home, in violation of the Constitution. In a related lawsuit, the National Rifle Association and two residents of Oak Park, a Chicago suburb, filed a complaint in the United States District Court for the Northern District of Illinois, seeking a declaration that several Oak Park ordinances were invalid pursuant to the Second and Fourteenth Amendments. That complaint alleged that, but for the gun control laws, the individual plaintiffs would keep handguns in their homes for self-defense.

The statutes at issue were "similar to the District of Columbia's," according to the Court. —— U.S. at ——, 130 S.Ct. at 3026, 177 L.Ed.2d at 903. Section 8–20–040(a) of the Chicago, Illinois Code prohibited possession of a firearm unless registered, while Section 8–20–050(c) provided that "[n]o registration certificate shall be issued for any of the following types of firearms ... (c) Handguns." The only non-governmental exception to the prohibition against handguns was for "[t]hose validly registered to a current owner in the City of Chicago prior to [1982]." Section 27–2–1 of the Oak Park, Illinois Code also provided that "[i]t shall be unlawful for any person to possess or carry, or for any person to permit another to possess or carry on his/her land or in his/her place of business any firearm." Section 27–1–1, in turn, defined "firearms" as "pistols, revolvers, guns and small arms of a size and character that may be concealed on or about the person, commonly known as handguns."

The district court judge entered judgment on the pleadings for both municipalities. The United States Court of Appeals for the Seventh Circuit affirmed, reasoning that the Supreme

---

Whether the Second Amendment right to keep and bear arms is incorporated as against the States by the Fourteenth Amendment's Privileges or Immunities or Due Process Clauses.

Court had never considered whether the Second Amendment should be applied to the States through the Due Process Clause of the Fourteenth Amendment. *Nat'l Rifle Ass'n v. City of Chicago, Illinois and Village of Oak Park, Illinois,* 567 F.3d 856 (7th Cir.2009).

In reversing, the Supreme Court determined that the Second Amendment right to keep and bear arms "is fundamental to *our* scheme of ordered liberty," and as a result, the Due Process Clause rendered it applicable to the States. *Id.* at ——, 130 S.Ct. at 3036, 177 L.Ed.2d at 914, citing *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). The Court characterized *Heller* as safeguarding an individual right of "self-defense," when home possession was in issue, *id.* at ——, 130 S.Ct. at 3036, 177 L.Ed.2d at 914, but, nevertheless, reiterated that regulatory schemes prohibiting handgun ownership by dangerous individuals, or prohibiting wearing, carrying, or transporting handguns in various public places outside of the home, were permissible:

> We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."

*Id.* at ——, 130 S.Ct. at 3047, 177 L.Ed.2d at 926, quoting *Heller,* 554 U.S. at 626–27, 128 S.Ct. at 2817, 171 L.Ed.2d at 678.[10]

---

**10.** In determining that *Heller* and *McDonald* addressed prohibitions and limitations on handgun possession in the home, we find informative decisions from other courts interpreting those opinions. *See United States v. Marzzarella,* 614 F.3d 85, 92 (3d Cir.2010) (reasoning that *Heller* and *McDonald* recognized that "the Second Amendment protects the right of law-abiding citizens to possess [handguns] for self-defense in the home"); *United States v. Skoien,* 614 F.3d 638, 640 (7th Cir.2010) (noting that *Heller* recognized that "the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense"); *People v. Dykes,* 46 Cal.4th 731, 95 Cal.Rptr.3d 78, 209 P.3d 1, 49 (2009) (concluding that a statute prohibiting possession

In the present case, Section 4–203(a)(1)(i) of which Williams was convicted, prohibits "wear[ing], carry[ing], or transport[ing] a handgun, whether concealed or open, on or about the person," in public, without a permit. Here, sufficient evidence was adduced to demonstrate that Williams was wearing, carrying, or transporting a handgun in public, and

---

of a loaded and concealed firearm without a permit did not violate the Second Amendment, because *Heller* recognized a limited right to keep and bear arms for personal protection in the home); *State v. Knight*, 42 Kan.App.2d 893, 218 P.3d 1177, 1189 (2009) (reasoning that a statute which criminalizes the possession of a concealed firearm was outside the province of the Second Amendment, because the Supreme Court's decision in *Heller* "turned solely on the issue of handgun possession in the home"); *Commonwealth v. Runyan*, 456 Mass. 230, 922 N.E.2d 794, 799 (2010) (determining that a statute requiring safe storage of a firearm was outside the scope of the Second Amendment, because the statute in issue "does not make it impossible for those persons licensed to possess firearms to rely on them for lawful self-defense" as did the District of Columbia ordinances in *Heller* ); *People v. Perkins*, 62 A.D.3d 1160, 1161, 880 N.Y.S.2d 209 (N.Y.App.Div.2009) (reasoning that "New York's licensing requirement remains an acceptable means of regulating the possession of firearms," because the statute at issue did not "effect a complete ban on handguns" as in *Heller* ); *State v. Sieyes*, 168 Wash.2d 276, 225 P.3d 995, 1005 (2010) (determining that a statute regulating the circumstances under which children could lawfully possess firearms was outside the scope of the Second Amendment, because no authority supported "an original meaning of the Second Amendment, which would grant children an unfettered right to bear arms").

In addition, after oral argument in the present case, the District of Columbia Court of Appeals filed *Herrington v. United States*, 6 A.3d 1237 (D.C.2010), upon which Williams relies, in which the defendant was convicted of "unlawful possession of ammunition," after police found two boxes of ammunition in his bedroom. The statute in issue required the prosecution to demonstrate only "that the defendant possessed ammunition, and that he did so knowingly and intentionally." *Id.* at 1240. Herrington argued that his conviction should be reversed, because the Second Amendment as interpreted by the Supreme Court in *Heller* "encompass[ed] the possession of handgun ammunition in the home." *Id.* at 1241. The court reversed Herrington's conviction, reasoning that "the Second Amendment guarantees a right to possess ammunition in the home that is coextensive with the right to possess a usable handgun there." *Id.* at 1243. Thus, *Herrington* is consistent with our interpretation of *Heller* and *McDonald* as addressing prohibitions against handgun possession in the home, as banning possession of ammunition in the home would certainly undermine the interest in "defense of self, family, and property" recognized in *Heller.*

Williams had conceded that he had not obtained, or even applied for, a permit.

Williams, however, attempts to bring his conviction of wearing, carrying, or transporting a handgun in public, without a permit, within the ambit of *Heller* and *McDonald* by claiming that those opinions would prohibit his conviction. This is not the case, because *Heller* and *McDonald* emphasize that the Second Amendment is applicable to statutory prohibitions against home possession, the dicta in *McDonald* that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home," notwithstanding. —— U.S. at ——, 130 S.Ct. at 3044, 177 L.Ed.2d at 922. Although Williams attempts to find succor in this dicta, it is clear that prohibition of firearms in the home was the gravamen of the certiorari questions in both *Heller* and *McDonald* and their answers. If the Supreme Court, in this dicta, meant its holding to extend beyond home possession, it will need to say so more plainly.

Williams was convicted of wearing, carrying, or transporting a handgun in public, rather than for possession of a handgun in his home, for which he *could not* be prosecuted under Section 4–203(b)(6). It is the exception permitting home possession in Section 4–203(b)(6) that takes the statutory scheme embodied in Section 4–203 outside of the scope of the Second Amendment, as articulated in *Heller* and *McDonald.* Section 4–203(b)(6) clearly permits wearing, carrying, or transporting a handgun "by a person on real estate that the person owns or leases or where the person resides," without registering or obtaining a permit, wholly consistent with *Heller's* proviso that handguns are "the most preferred firearm in the nation to keep and use for protection of one's home and family." 554 U.S. at 628–29, 128 S.Ct. at 2817–18, 171 L.Ed.2d at 689.

In affirming Williams' conviction, we find persuasive opinions from other courts, addressing analogous situations, in which a defendant was convicted pursuant to a statute prohibiting public possession of a firearm, while providing an excep-

tion for possession within the home. For example, in *People v. Dawson*, 403 Ill.App.3d 499, 343 Ill.Dec. 274, 934 N.E.2d 598 (2010), Dawson had been found guilty of three counts of aggravated discharge of a firearm and two counts of aggravated unlawful use of a weapon in connection with the attempted murder of Mario Brantley. *Id.*, 343 Ill.Dec. 274, 934 N.E.2d at 599. Dawson argued that his convictions under the Illinois aggravated unlawful use of a weapon statute should be reversed, because the measure violated the Second Amendment. *Id.*, 343 Ill.Dec. 274, 934 N.E.2d at 599–600. The Illinois aggravated unlawful use of a weapon statute under which Dawson was convicted mirrors Maryland's Section 4–203 and relevantly provides:

"(a) A person commits the offense of aggravated unlawful use of a weapon when he or she knowingly:

(1) Carries on or about his or her person or in any vehicle or concealed on or about his or her person *except when on his or her land or in his or her abode or fixed place of business* any pistol, revolver, stun gun or taser or other firearm;

* * *

[and]

* * *

(3) One of the following factors is present:

(A) the firearm possessed was uncased, loaded and immediately accessible at the time of the offense[.]"

*Id.*, 343 Ill.Dec. 274, 934 N.E.2d at 604, quoting 720 ILCS 5/24–1.6(a)(1), (a)(3)(A) (West 2006) (alteration in original) (emphasis added). The Illinois intermediate appellate court affirmed Dawson's conviction, reasoning that in *Heller*, the Supreme Court "ultimately limited its holding to the question presented—that the Second Amendment right to bear arms protected the right to possess a commonly used firearm, a handgun, in the home for self-defense purposes." *Id.*, 343 Ill.Dec. 274, 934 N.E.2d at 605 The court further emphasized that, in *McDonald*, the Supreme Court addressed "the limited question of whether a ban on the possession of a handgun in

the home violated the Second Amendment right to bear arms." *Id.* The court concluded that the statute under which Dawson was convicted was constitutional, because it specifically permitted possession of a firearm within one's home. *Id.,* 343 Ill.Dec. 274, 934 N.E.2d at 607.

In *Little v. United States,* 989 A.2d 1096 (D.C.2010), Little was convicted by a jury of one count of carrying a pistol without a license, one count of possession of an unregistered firearm, and one count of unlawful possession of ammunition, as a result of his involvement in an attempted robbery. Little argued that his convictions must be reversed in light of the Supreme Court's decision in *Heller,* because the statutes "functioned as a total ban on handguns." *Id.* at 1100. The District of Columbia Court of Appeals rejected that argument and affirmed Little's conviction, reasoning that in *Heller,* "the issue was the constitutionality of the District of Columbia's ban on 'the possession of usable handguns *in the home,*'" *id.* at 1101, quoting *Howerton v. United States,* 964 A.2d 1282, 1287 (D.C.2009), and Little had conceded that he was outside of his home.

In *People v. Yarbrough,* 169 Cal.App.4th 303, 86 Cal.Rptr.3d 674 (Cal.Ct.App.2008), Yarbrough was arrested and convicted of carrying a concealed weapon in public, in violation of a California statute, which provided:

A person is guilty of carrying a concealed firearm when he or she does any of the following:

(1) Carries concealed within any vehicle which is under his or her control or direction any pistol, revolver, or other firearm capable of being concealed on the person.

(2) Carries concealed upon his or her person any pistol, revolver, or other firearm capable of being concealed upon the person.

(3) Causes to be carried concealed within any vehicle in which he or she is an occupant any pistol, revolver, or other firearm capable of being concealed upon the person.

*Id.* at 313 n. 5, 86 Cal.Rptr.3d 674, quoting Section 12025(a) of the California Penal Code. The California intermediate appel-

late court noted that a separate measure provided an exception for possession of concealed weapons "anywhere within the citizen's or legal resident's place of residence, place of business, or on private property owned or lawfully possessed by the citizen or legal resident." *Id.* at 314 and n. 6, 86 Cal. Rptr.3d 674, quoting Section 12026 of the California Penal Code. Although Yarbrough argued that the concealed weapons statute was unconstitutional in light of *Heller,* the court rejected that argument and affirmed his conviction, reasoning that in *Heller,* the Supreme Court considered a narrow question, namely whether "the District's ban on handgun possession in the home violate[d] the Second Amendment." *Id.* at 312, 86 Cal.Rptr.3d 674. The court concluded that, "[u]nlike possession of a gun for protection within a residence, carrying a concealed firearm presents a recognized threat to public order, and is prohibited as a means of preventing physical harm to persons other than the offender." *Id.* at 314, 86 Cal. Rptr.3d 674 (internal quotation marks omitted).

As a result, we affirm Williams' conviction of wearing, carrying, or transporting a handgun in violation of Section 4–203(a)(1)(i) of the Criminal Law Article.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

MURPHY, J., concurs.

MURPHY, J., concurring.

While I agree with the majority that the Petitioner's conviction should be affirmed, I would not hold that the Petitioner's conduct is "outside of the scope of the Second Amendment." I would affirm on the ground that, although the Second Amendment is applicable to an "on the street" possession of a handgun, that Amendment is *satisfied* by a statute that places reasonable restrictions on the constitutional right to bear arms.